**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Stanford KATZ, Defendant-Appellant.**

No. 75–1318.

United States Court of Appeals,
Tenth Circuit.

Argued Jan. 26, 1976.
Decided April 27, 1976.

Philip J. Adams, Jr., Special Atty., U. S. Dept. of Justice, Washington, D. C. (E. Edward Johnson, U. S. Atty., District of Kansas, Topeka, Kan., on the brief), for plaintiff-appellee.

Robert G. Duncan, Gladstone, Mo. (William E. Shull and Duncan & Russell, Gladstone, Mo., on the brief), for defendant-appellant.

Before McWILLIAMS, BARRETT and DOYLE, Circuit Judges.

McWILLIAMS, Circuit Judge.

Stanford Katz, a practicing lawyer who also operates a stamp and coin shop in Kansas City, Missouri, was convicted of conspiracy in violation of 18 U.S.C. § 371, and was also convicted on two additional counts of knowingly transporting in interstate commerce from Leawood, Kansas to Kansas City, Missouri stolen goods, wares and merchandise, namely, a stamp collection of a value of more than $5,000, in violation of 18 U.S.C. § 2314, and in a separate count of knowingly receiving, concealing and disposing of said stamp collection in violation of 18 U.S.C. § 2315.

On appeal Katz raises four points: (1) the trial court should have quashed the indictment, and erred in refusing to do so, because the Government's Attorneys who presented evidence to the Grand Jury lacked authority to appear before the Grand Jury; (2) the trial court erred in refusing to direct a verdict in favor of the defendant because the stamp collection here involved comes within the exclusion clauses of 18 U.S.C. § 2314 and § 2315; (3) the trial court erred in admitting into evidence, prior to any showing that Katz was involved in a conspiracy, declarations made by one of the alleged co-conspirators out of the presence of Katz which implicated Katz; and (4) refusal by the trial court to instruct the jury that prior inconsistent statements allegedly made by certain of the Government's witnesses could not be considered as substantive evidence, and were to be considered solely for impeachment purposes. We find no reversible error and accordingly affirm. The facts are a bit on the bizarre side, and a brief recital thereof will put the case in focus.

Katz resides in Overland Park, Kansas but maintains his law offices in Kansas City, Missouri, where, in connection with his law offices, he also maintains a combination stamp, coin and gift shop. Katz was admittedly well acquainted with both Gary Vance Jensen and Jack E. Gillispie, having previously represented each in connection with criminal proceedings. Jensen and Gillispie were both convicted on several occasions and each has served time as a result of his convictions. The evidence indicated that Gillispie later had one of his convictions

reversed on appeal on the grounds that Katz had rendered him ineffective assistance of counsel. Katz testified that he had in fact given Gillispie some erroneous advice, and that he felt "very bad" about the turn of events. This general line of testimony was fully developed by Katz himself in an effort to show that Gillispie had ample motive to testify falsely against him.

The key Government witness was perhaps Jack Gillispie. He testified that he and his friend Jensen had gone to Katz' office where he (Gillispie) had a conversation, in private, with Katz. Gillispie testified that he advised Katz that he was broke and offered to "pull" a burglary for Katz. According to Gillispie, Katz suggested that Gillispie burglarize the home of one Osborne Morse, a stamp collector residing in a suburb of Kansas City, Kansas, and thus obtain the Morse stamp collection, including his "Graf-Zeppelin" collection and a "couple of sheets of Ben Franklins." According to Gillispie, he was to receive $20,000 for his efforts. In any event, Gillispie readily agreed to commit the burglary, and as he and Jensen left, Gillispie informed Jensen of his conversation with Katz and enlisted Jensen's aid in the proposed burglary.

The burglary of the Morse home turned into an armed robbery. Jensen and Gillispie decided that a burglary of the Morse home was too risky, and accordingly determined to steal the stamp collection in an armed robbery. Jensen and others, with Gillispie acting as a sort of overall supervisor, robbed Mr. and Mrs. Morse at gunpoint, and thus obtained the Morse stamp collection. They put the stamp collection in the trunk of Morse's automobile, and then drove across the state line into Kansas City, Missouri. According to both Jensen and Gillispie, the stamps in question were a few days later delivered to Katz, who only paid them $2,000, however, with a promise to pay an additional $2,000, which payment never materialized.

The evidence tying Katz into the conspiracy and the substantive charges of interstate transportation and receiving of stolen goods in excess of $5,000 came in the main

from the testimony of Jensen and Gillispie, and particularly the latter. However, there was other evidence which was of such a nature as to permit the jury to infer that stamps from the Morse collection were later offered for sale by Katz. Katz took the witness stand in his own behalf and categorically denied that he had ever entered into any conspiracy to steal the Morse stamp collection, or that he had ever received the Morse stamp collection from Gillispie and Jensen. As indicated, his testimony concerning his prior representation of Gillispie, and Jensen, was calculated to show that both had ample motive to falsely testify against him. It was on this general state of the record that the jury convicted Katz on each of the three counts in the indictment.

■ Two special attorneys of the Department of Justice were appointed pursuant to the provisions of 28 U.S.C. § 515(a) to present this entire matter to the Grand Jury, and one of these attorneys was the prosecuting attorney in the trial of the case. Counsel in his brief attacks the sufficiency of this appointment on a variety of grounds and contends that the special attorneys did not possess proper authorization to appear before the Grand Jury. On oral argument counsel conceded that recent cases from other Circuits have specifically rejected this line of argument. See, for example, such cases as *Infelice v. United States,* 528 F.2d 204 (7th Cir. 1975); *In re Persico,* 522 F.2d 41 (2d Cir. 1975); *United States v. Wrigley,* 520 F.2d 362 (8th Cir. 1975); *United States v. Agrusa,* 520 F.2d 370 (8th Cir. 1975); and *DiGirlomo v. United States,* 520 F.2d 372 (8th Cir. 1975), cert. denied, 423 U.S. 1033, 96 S.Ct. 565, 46 L.Ed.2d 407. Subsequent to oral argument this Court has itself had occasion to consider the sufficiency of an appointment under 28 U.S.C. § 515(a) and in each instance we upheld the particular appointment under attack. *See United States v. Ratley,* (10th Cir. 1976), our No. 75–1403, filed April 1, 1976, and *United States v. Pauldino,* (10th Cir. 1976), our Nos. 75–1336, 75–1410, and 75–1411, filed March 17, 1976. Under such authority we con-

clude that in the instant case the special attorneys for the Department of Justice did have proper authority to appear before the Grand Jury.

The second ground for reversal relates to the exclusion clauses appearing in 18 U.S.C. § 2314 and § 2315. The indictment charged the defendants, in the language of the statute, with transporting in interstate commerce stolen "goods, wares and merchandise," and the receiving of the same. The "goods, wares and merchandise" were identified in the indictment as a stamp collection of a value in excess of $5,000. Both §§ 2314 and 2315 contain the following exclusion clause:

This section shall not apply to any falsely made, forged, altered, counterfeited or spurious representation of an obligation or other security of the United States, or of an obligation, bond, certificate, security, treasury note, bill, promise to pay, or bank note, issued by any foreign government or by a bank or corporation of any foreign country.

The term "obligation or other security of any foreign government" is defined in 18 U.S.C. § 15 as follows:

The term "obligation or other security of any foreign government" includes, but is not limited to, uncanceled stamps, whether or not demonetized.

■ We do not believe that the Morse stamp collection comes within the exclusion clause in § 2314 or § 2315 for several reasons. In the first place, Morse's testimony concerning the stolen stamps was such as to permit the jury to infer that virtually all, if not indeed all, of the stamps taken in the robbery were canceled stamps, and not minted or uncanceled stamps. It is conceded here that the exclusion, at most, covers *uncanceled* stamps of a foreign government, and in view of Morse's testimony it would appear that the exclusion contained in §§ 2314 and 2315 is inapplicable.

The Government also argues that the exclusionary language in the two related sections of the statutes excludes only falsely made obligations of either the United States or of any foreign country, and that

in the instant case there is no evidence that any uncanceled stamps which might conceivably have been taken in the Morse robbery were either falsely made or counterfeited. In thus arguing counsel relies on the rationale of such cases as *United States v. Galardi*, 476 F.2d 1072 (9th Cir. 1973), *cert. denied*, 414 U.S. 839, 94 S.Ct. 90, 38 L.Ed.2d 75 and 414 U.S. 856, 94 S.Ct. 160, 38 L.Ed.2d 106 (1973).

■ In *Galardi* the Ninth Circuit delved into the legislative history of 18 U.S.C. § 2314 and, though it was not germane to the problems there at hand, the Ninth Circuit noted that the phrase "falsely made" as contained in the exclusion applied equally to obligations of the United States and to obligations of foreign countries. It would appear from a casual reading that the exclusion does relate to *counterfeited* obligations of both the United States or a foreign country, and does not exclude *genuine* obligations of either the United States or foreign countries. However, we need not here resolve this particular matter, inasmuch as we have, as indicated above, found the exclusion inapplicable to the facts of the case at hand. In this general regard we would note that we are not really concerned with obligations, i. e., stamps, of a foreign country, be they uncanceled or otherwise. We are here concerned with a stamp collection, which in our view comes well within the meaning of the phrase "goods, wares and merchandise," as that phrase is used in the statute and as such language was carried over into the several counts in the indictment returned against Katz. A stamp collection, as such, is not in our view within the exclusion clause of either § 2314 or § 2315.

The third ground urged for reversal relates to a ruling by the trial court concerning the admissibility of certain testimony elicited from witness Gary Jensen. The government called Jensen as its first witness. He testified as to the events which transpired when he and Gillispie went to Katz' office and the burglary of Morse's home was first suggested. His testimony was that Katz insisted that he (Katz) con-

verse with Gillispie in private, and that for that reason he was unable to overhear what was actually said between the two. However, Jensen was then asked by the prosecuting attorney to relate his conversation with Gillispie after the two of them had left Katz' office. Objection was made on the ground that such called for hearsay, and that since it had not yet been established that Katz was a part of any conspiracy, the proposed line of questioning did not fall within any exception to the hearsay rule. The trial court overruled this objection with the comment that "the Government can't dump in all their evidence at once." The witness Jensen then testified that Gillispie stated that Katz had suggested a burglary and that Gillispie thereupon asked him, Jensen, if he would participate in the burglary.

In connection with this particular matter the prosecuting attorney did advise the trial court that the Government intended to later tie Katz into the conspiracy through the testimony of another witness. And the Government did follow through on its promise when it later called as one of its witnesses Jack Gillispie, who most definitely did tie Katz into the conspiracy and indeed identified Katz as the originator of the conspiracy. On appeal, Katz argues that it was reversible error on the part of the trial court to permit Jensen's testimony as to statements made to him by Gillispie. The only argument advanced here in support of this particular ground for reversal is that at the time Jensen was permitted to testify Katz was not yet tied into any conspiracy, and that it was error to permit Jensen to thus testify "out of order."

■ Under the circumstances as above summarized, we find no reversible error on the part of the trial court in permitting Jensen to testify as to statements made to him by Gillispie in furtherance of the conspiracy. As indicated, Gillispie's testimony, subsequently given, clearly tied Katz into the conspiracy, and in this regard there was other independent evidence tending to corroborate Gillispie's testimony. In our view, then, any possible error would at best be only harmless error. In this connection we also note that the trial court in its instructions clearly advised the jury that Katz "cannot be bound by the acts or declarations of other participants until it is established that a conspiracy existed, and that he was one of its members." Our study of the record leads us to conclude that this particular ground of alleged error is governed by the general rule that the order of proof at trial is a matter almost wholly within the discretion of the trial court. Under the circumstances, we find no abuse of that discretion by the trial judge in the instant case. *See United States v. Kramer,* 521 F.2d 1073 (10th Cir. 1975), and *Nelson v. United States,* 415 F.2d 483 (5th Cir. 1969).

■ The final reason advanced as grounds for reversal relates to the refusal of the trial court to give an instruction that any prior inconsistent statements of a Government witness brought out on cross-examination could only be used for impeaching purposes, and should not be considered by the jury as so-called "substantive evidence." This identical argument was recently considered by us and rejected with only brief comment in *United States v. Russo,* 527 F.2d 1051 (10th Cir. 1975). In the instant case the trial court did instruct the jury that any witness, including the defendant, could be discredited or impeached by proof of prior contradictory statements or acts, and that it was solely within the province of the jury to determine whether any witness had in fact been impeached, and if so, the degree of credibility, if any, that should attach to this testimony. We believe that the instructions given the jury on this matter were adequate and that it was not error to refuse to give the instruction suggested by defense counsel.

Actually the suggested instruction did not, in our view, fit the facts of the case. The Government's witnesses about whom complaint is now made implicated Katz in their direct examination, and any prior inconsistent statements brought out in cross-examination related to only minor details. In other words, the witnesses Gillispie and Jensen, for example, implicated Katz in

both their direct and cross-examination, and any prior inconsistent statements related only to insignificant details, and not to the basic fact that Katz was not only involved in the conspiracy, but was in fact the instigator of the plan to steal Morse's stamp collection. In this general regard it is of course a bit difficult to perceive just how Gillispie and Jensen could have on their own decided to steal a stamp collection and somehow ascertained that Morse had such a collection. Such lends credence to the testimony, which the jury obviously felt inclined to follow, that Katz was the originator of the conspiracy, which was indeed the central theme of Jensen and Gillispie, both during their direct and cross-examination. Any prior inconsistent statements by either did not pertain to the essentials of their testimony.

Judgment affirmed.